**SECOND DIVISION
BARNES, P. J.,
ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/**

**July 3, 2012**

# In the Court of Appeals of Georgia

A12A0654. JACKSON v. THE STATE.

BARNES, Presiding Judge.

A jury found Anthony Jackson guilty of two counts of aggravated assault, two counts of aggravated battery, and burglary.[1] The trial court denied his motion for new trial. On appeal, Jackson raises multiple enumerations of error. He contends that there was insufficient evidence to convict him of the charged offenses, that the burglary count of the indictment was fatally defective, and that the trial court erred by not permitting him to impeach one of the victims with a first offender guilty plea. Jackson further contends that the trial court committed several errors in its charge to the jury

---

[1] Jackson was previously tried and convicted of the same offenses, but his prior conviction was reversed on appeal as a result of improper witness testimony about his criminal history. See *Jackson v. State*, 302 Ga. App. 412, 413-417 (1) (691 SE2d 553) (2010).

and that his trial counsel rendered ineffective assistance. For the reasons set forth below, we affirm.

1. Jackson challenges the sufficiency of the evidence to convict him of the charged offenses. In reviewing whether the evidence was sufficient,

> we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence. We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

(Citations and punctuation omitted.) *Sidner v. State*, 304 Ga. App. 373, 374 (696 SE2d 398) (2010).

Viewed in this manner, the evidence showed that Jackson and the female victim, his former girlfriend, had been involved in an "off and on" intimate relationship lasting several years, had a daughter together, and lived with one another for a period of time at the victim's apartment in Chatham County. Their relationship was tumultuous and marked by episodes of physical violence. In October 2005, the girlfriend broke up with Jackson for the last time and told him to stay out of her apartment, and he moved back into his mother's house. Because she had ended her

2

relationship with Jackson, the girlfriend had the locks changed on her apartment doors.

In the early morning hours of January 15, 2006, Jackson's former girlfriend and her new boyfriend were spending the night at her apartment. The girlfriend and her boyfriend had been romantically involved previously, and Jackson and the boyfriend knew of one another.[2]

At the time of the attack at issue in this case, the girlfriend and her boyfriend were together in bed in the upstairs bedroom. The girlfriend was watching television, and her boyfriend was asleep beside her. Jackson suddenly entered the bedroom with a steak knife in his hand that had been retrieved from the downstairs kitchen. He approached the bed "real fast" with the knife. The boyfriend awoke when he heard his girlfriend say in a frightened voice to Jackson, "How the f**k you get in my house?" The girlfriend tried to grab the knife from Jackson, but he cut her hand. When the boyfriend sat up in bed, Jackson stabbed him in the spine. As Jackson tried to pull the knife out, the blade broke off in the boyfriend's back. Jackson then reached for a baseball bat that the girlfriend kept by her bed for personal protection, and the

---

[2] Jackson and the boyfriend had known each other for approximately 15 to 20 years but were not friends. Both men had fathered children with the same woman before they became involved with the female victim in this case.

boyfriend began "tussling" with him over it. During the struggle over the bat, the boyfriend fell from the bed onto the floor, and Jackson fled from the bedroom. Unable to get up from the floor, the boyfriend realized that he could not feel his legs.

After Jackson fled from the bedroom, his former girlfriend headed downstairs to call the police on the land-line in the kitchen. Upon retrieving another steak knife from the kitchen, Jackson attacked her on the stairway. While calling her a "bitch" and a "whore," Jackson cut his former girlfriend with the knife on the back of her head, on the side of her face, and on her shoulder and back. Jackson slashed her across the nose with the knife and stabbed her in the stomach. Jackson eventually stopped striking his former girlfriend with the knife and fled from the apartment.

The girlfriend ran outside and had a neighbor call 911. After the police and emergency medical technicians arrived at the scene, she and her boyfriend were taken to the hospital. Her boyfriend was hospitalized for over a month after the attack. He was paralyzed as a result of his spinal cord injury. The girlfriend received staples and stitches for her cuts and stab wounds, and she continues to bear scars on her body from the knife attack. After the attack, Jackson's former girlfriend and her boyfriend got married and have remained married, although his paralysis has made their marriage difficult over the years.

4

Based upon his entering and remaining in the apartment and his stabbing of his former girlfriend and her new boyfriend, Jackson was charged and tried before a jury on two counts of aggravated assault, two counts of aggravated battery, and burglary.[3] The two victims of the knife attack testified to the events as set out above, and the jury also heard from the patrol officer who responded to the scene of the attack, as well as the forensic investigator and detective who were involved in the case. Jackson chose not to testify, although he presented witness testimony through which he attempted to establish that he was still living with his girlfriend at the time of the attack. After hearing all of the testimony, the jury found Jackson guilty of the charged offenses, and the trial court merged the aggravated assault convictions into the aggravated battery convictions for sentencing purposes. Jackson filed a motion for new trial, which the trial court denied, leading to this appeal.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Jackson guilty beyond a reasonable doubt of the two counts of aggravated battery and

---

[3] As noted supra in footnote 1, this was the second jury trial. In the first trial, Jackson was acquitted of armed robbery and two additional counts of aggravated assault.

burglary for which he was convicted.[4] See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). The testimony of the victims, standing alone, was sufficient to sustain the convictions. See OCGA § 24-4-8 ("The testimony of a single witness is generally sufficient to establish a fact."); *Obeginski v. State*, 313 Ga. App. 567, 569 (1) & n. 5 (722 SE2d 162) (2012). And it was the role of the jury, not this Court, "to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (Citation and punctuation omitted.) *Farris v. State*, 290 Ga. 323, 324 (1) (720 SE2d 604) (2012).

Jackson, however, argues that there was insufficient evidence to convict him of aggravated battery for stabbing his former girlfriend because her wounds were "superficial" and no "medical evidence was presented by trained physicians to explain the injury." Consequently, Jackson contends, there was insufficient evidence that the girlfriend suffered serious disfigurement, one of the elements of aggravated battery as charged in this case. See OCGA § 16-5-24 (a) ("A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another . . . by seriously disfiguring his or her body or a member thereof.").

---

[4] We need not address the sufficiency of the evidence as to the merged aggravated assault counts, given that the trial court did not enter judgment on them. See *Mays v. State*, 306 Ga. App. 507, 509 (1), n. 3 (703 SE2d 21) (2010).

6

We are unpersuaded because the evidence showed that Jackson's former girlfriend bore scars as a result of her stab wounds. Whether the scars rose to the level of serious disfigurement was a factual issue for the jury to resolve. See *Grace v. State*, 210 Ga. App. 718, 719 (2) (437 SE2d 485) (1993); *Barfield v. State*, 170 Ga. App. 796, 797 (2) (318 SE2d 219) (1984). Nor was the State required to present expert testimony from a physician to prove serious disfigurement. See *Holloway v. State*, 269 Ga. App. 500, 503 (2) (604 SE2d 844) (2004). The jury, which heard from the girlfriend and saw her scars, was authorized to find from the evidence that the girlfriend was seriously disfigured as a result of the knife attack. See id. Jackson's argument, therefore, is without merit.

2. Jackson maintains that the burglary count of the indictment was defective because the offense was misnamed as "aggravated battery." Specifically, Count 5 of the indictment stated:

COUNT [FIVE]: BUGLARY [sic]

(OCGA § 16-7-1)

And the jurors aforesaid, in the name and behalf of the citizens of Georgia, further charge and accuse ANTHONY JACKSON with having committed the offense of AGGRAVATED BATTERY [sic], for that the

7

said ANTHONY JACKSON, in the County of Chatham and State of Georgia, did knowingly, intentionally, unlawfully and without authority, on or about January 15, 2006, enter or remain within the dwelling house of another, to wit: [his former girlfriend's apartment], with the intent to commit a felony, to wit: aggravated assault, therein, contrary to the laws of the State of Georgia, the good order, peace and dignity thereof.

According to Jackson, the mislabeling of the offense as "aggravated battery" in the body of the indictment required the trial court to grant his motion to quash Count 5.

We disagree. As an initial matter, we note that "[a]n accused may challenge the sufficiency of an indictment by filing a general or special demurrer. A general demurrer challenges the sufficiency of the substance of the indictment, whereas a special demurrer challenges the sufficiency of the form of the indictment." (Citation, punctuation, and emphasis omitted.) *State v. Corhen*, 306 Ga. App. 495, 496-497 (700 SE2d 912) (2010). Under OCGA § 17-7-110, a special demurrer must be filed within ten days after the arraignment, unless the trial court extends the time for filing. See *Palmer v. State*, 282 Ga. 466, 468 (651 SE2d 86) (2007). But "[a] general demurrer, in which a defendant contends that the charging instrument fails altogether to charge him with a crime, may be raised at any time" before the trial court. See *Kain*

8

*v. State*, 287 Ga. App. 45, 48 (2) (650 SE2d 749) (2007); *Moore v. State*, 246 Ga. App. 163, 165 (3) (539 SE2d 851) (2000).

While Jackson did not file a timely special demurrer and thus waived his right to a perfect indictment, see *Jones v. State*, 289 Ga. 111, 115 (2) (c) (709 SE2d 773) (2011), his motion to quash the indictment can be construed as a timely general demurrer. See *Kain*, 287 Ga. App. at 48 (2).

> In determining the sufficiency of an indictment to withstand a general demurrer, the following test is applied: If all the facts which the indictment charges can be admitted, and still the accused be innocent, the indictment is bad; but if, taking the facts alleged as premised, the guilt of the accused follows as a legal conclusion, the indictment is good. An indictment which charges the offense in the language of the defining statute and describes the acts constituting the offense sufficiently to put the defendant on notice of the offense with which he is charged survives a general demurrer.

(Footnote omitted.) *Pulliam v. State*, 309 Ga. App. 477, 479-480 (2) (711 SE2d 21) (2011).

The burglary count of the indictment was sufficient to withstand a general demurrer. Although the offense was mislabeled as "aggravated battery" in the body of Count 5, "it is immaterial what the offense is called, if the averments of the

9

presentment are such as to describe an offense against the laws of the [S]tate. It is not the name given to the bill which characterizes it, but the description in the averments of the indictment." (Citation and punctuation omitted.) *Williams v. State*, 165 Ga. App. 69, 71 (4) (299 SE2d 402) (1983). See *State v. Eubanks*, 239 Ga. 483, 484 (238 SE2d 38) (1977), superseded in part on other grounds as stated in *Palmer*, 282 Ga. 466; *Striplin v. State*, 284 Ga. App. 92, 94-95 (643 SE2d 361) (2007). The averment portion of Count 5, which described the offense that had been committed by Jackson, followed the language of the burglary statute and fully apprised him of the offense charged. See OCGA § 16-7-1 (a).[5] Furthermore, the subject heading of Count 5 (although misspelled) clearly referred to the offense as burglary, and the heading was followed by a citation to the burglary statute itself. Hence, Count 5 charged the offense in the language of the defining statute and described the acts constituting the offense sufficiently to put Jackson on notice that he was being charged with burglary. It follows that Count 5 was sufficient to survive a general demurrer, and we find no merit to this enumeration.

---

[5] OCGA § 16-7-1 (a) provides in relevant part: "A person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another . . . ."

10

3. Jackson also contends that Count 5 of the indictment was defective because burglary was misspelled as "buglary" in the subject heading. Yet, at the hearing on the motion for new trial, Jackson conceded that the misspelling was not a ground for reversal. Because Jackson abandoned this enumeration of error at the hearing, it is not properly preserved for appellate review. See *Donald v. State*, 312 Ga. App. 222, 229 (4) (e) & n. 15 (718 SE2d 81) (2011); *Vincent v. State*, 276 Ga. App. 415, 417 (3) (623 SE2d 255) (2005).

4. Jackson argues that the trial court erred by prohibiting him from impeaching the boyfriend with his guilty plea for possession of more than an ounce of marijuana. The boyfriend's plea to the marijuana charge had been accepted under the First Offender Act, OCGA § 42-8-60 et seq., and he had completed his sentence and been discharged without an adjudication of guilt prior to the trial in this case.

> [I]t is well-settled that the first offender record of one who is currently serving a first offender sentence or of one who has successfully completed the first offender sentence may not be used to impeach the first offender on general credibility grounds (i.e., by establishing that the first offender has been convicted of a felony or crime of moral turpitude) because no adjudication of guilt has been entered.

11

(Citation and punctuation omitted.) *Davis v. State*, 312 Ga. App. 328, 331 (2) (718 SE2d 559) (2011). See *Butler v. State*, 285 Ga. 518, 519-520 (2) (678 SE2d 92) (2009); *Davis v. State*, 269 Ga. 276, 277 (2) (496 SE2d 699) (1998). In contrast, evidence of a witness's first offender status is admissible to "reveal a possible bias, prejudice or ulterior motive on the part of the witness to give untruthful or shaded testimony in an effort to please the State." (Citation and punctuation omitted.) *Melson v. State*, 263 Ga. App. 647, 648 (2) (588 SE2d 822) (2003). See *Manley v. State*, 287 Ga. 338, 346 (5) (698 SE2d 301) (2010).

Jackson sought to admit evidence of the boyfriend's first offender guilty plea to impeach him on general credibility grounds, not to show bias, prejudice, or ulterior motive. Therefore, the trial court committed no error in prohibiting him from using the plea for impeachment. See *Davis*, 312 Ga. App. at 331 (2).[6]

---

[6] Citing to OCGA § 24-9-84.1 (c) (1), Jackson contends that a witness should be subject to impeachment despite a successful discharge under the First Offender Act, if the witness was "convicted of a subsequent crime that was punishable by death or imprisonment for one year or more," as was the boyfriend, who later pled guilty to another drug charge. We disagree because OCGA § 24-9-84.1 (c) (1) is inapposite. By its plain terms, that statutory subsection applies to a "*conviction* [that] has been the subject of a pardon or annulment." (Emphasis supplied.) OCGA § 24-9-84.1 (c) (1). In contrast, a defendant who successfully completes a first offender sentence cannot be said to have had a criminal conviction, given that there was never an adjudication of guilt. See OCGA § 42-8-62 (a); *Priest v. State*, 261 Ga. 651, 652 (2) (409 SE2d 657) (1991).

12

5. Jackson asserts that the trial court made several errors in its final charge to the jury. We will address each purported error separately.

(a) The trial court declined to charge the jury on the defense of justification, and Jackson contends that this was error. Under Georgia law, "[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself . . . against such other's imminent use of unlawful force[.]" OCGA § 16-3-21 (a). "[I]t is not error to refuse a justification charge where there is no evidence to support it." *Reese v. State*, 289 Ga. 446, 448 (2) (711 SE2d 717) (2011). Here, Jackson declined to testify at trial or present any defense witnesses to support a justification defense. Nor did his cross-examination of the State's witnesses reveal any evidence that would support a defense of justification. Rather, all of the evidence presented at trial pointed to Jackson as the initial aggressor who carried out an entirely unprovoked knife attack against defenseless victims. Consequently, Jackson's claim that the trial court should have charged the jury on justification lacks merit.

(b) The trial court charged the jury with the definition of an "offensive weapon" drawn from Section 2.60.31 of the Suggested Pattern Jury Instructions, Vol. II: Criminal Cases. Specifically, the trial court charged the jury:

13

An offensive weapon is any object, device, or instrument that, when used offensively against a person, is likely to or gives the appearance of being likely to or actually does result in serious bodily injury. The character of a weapon may be established by direct or circumstantial evidence.

Jackson contends that the trial court erred in giving this charge defining an "offensive weapon" because the charge is intended for armed robbery cases, where use of an "offensive weapon" is an element of the offense. See OCGA § 16-8-41 (a).[7] Because armed robbery was not one of the charged offenses in the retrial of this case,[8] Jackson argues that the "offensive weapon" definition was inapt and likely confused the jury, entitling him to a new trial.

We do not agree. As an initial matter, after the final jury charge, the State made the trial court aware that the "offensive weapon" definition had mistakenly been included in the instructions, and the court offered to recharge the jury in an effort to cure the mistake. However, Jackson chose not to make any objection to the "offensive

_____

[7] OCGA § 16-8-41 (a) provides in relevant part: "A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon."

[8] As noted supra in footnote 3, Jackson was acquitted of armed robbery in the first trial.

14

weapon" charge and expressly declined the trial court's offer to recharge the jury. Based on the law in effect at the time of the trial, Jackson was required to "inform the court of the specific objection and the grounds for such objection before the jury retire[d] to deliberate." OCGA § 17-8-58 (a);[9] *Walker v. State*, 305 Ga. App. 607, 616 (7) (699 SE2d 902) (2010). Moreover, given that Jackson expressly declined the trial court's offer to recharge the jury to cure any error in the initial charge, his complaint regarding the charge rings hollow. See *Jeffers v. State*, 290 Ga. 311, 316 (5) (721 SE2d 86) (2012) ("Since defense counsel declined the trial court's offer to give curative instructions to the jury, appellant will not now be heard to complain.") (citation, punctuation, and footnote omitted).

Nevertheless, regardless of the lack of preservation in the court below, we must review the trial court's charge on the definition of "offensive weapon" to determine whether it constituted plain error, given that Jackson has properly enumerated and argued the error on appeal. See OCGA § 17-8-58 (b); *State v. Kelley*, 290 Ga. 29, 31-32 (1) (718 SE2d 232) (2011). Reversal based on plain error is authorized if "the instruction was erroneous, the error was obvious, the instruction likely affected the

_____

[9] OCGA § 17-8-58 (a) applies to all trials occurring on or after July 1, 2007. See Ga. Laws 2007, p. 595, § 5.

15

outcome of the proceedings, and the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *White v. State*, __ Ga. __ (2) (Case No. SA12A0440, decided on April 24, 2012). See *Kelly*, 290 Ga. at 33 (2) (a). "Satisfying all four prongs of this standard is difficult, as it should be." (Citation and punctuation omitted.) *Kelley*, 290 Ga. at 33 (2) (a).

Irrespective of whether any of the other prongs were satisfied, there is no plain error because Jackson cannot show that the error likely affected the outcome of the proceedings. Jackson was charged and tried for having committed aggravated assault "with an object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." (Emphasis supplied.) OCGA § 16-5-21 (a) (2). He also was charged and tried for having committed burglary by entering or remaining in his former girlfriend's apartment with the intent to commit aggravated assault. And we have noted that the definition of "offensive weapon" applicable to armed robbery "mirrors very closely" the definition of aggravated assault set forth in OCGA § 16-5-21 (a) (2), and that an "offensive weapon" under the armed robbery statute "necessarily would fall within the category of weapons described in OCGA § 16-5-21 (a) (2)." *Taylor v. State*, 304 Ga. App. 395, 398 (1) & n. 2 (696 SE2d 686) (2010). See also *Long v. State*, 287 Ga. 886, 889 (2)

16

(700 SE2d 399) (2010). Hence, Jackson cannot demonstrate that the giving of the "offensive weapon" definition drawn from the pattern instructions on armed robbery likely had any effect on the jury's decision to convict him of aggravated assault or burglary with the intent to commit an aggravated assault, and, therefore, cannot establish plain error.[10]

(c) Count 4 of the indictment charged Jackson with aggravated battery. In its final charge, the trial court accurately read Count 4, but prefaced its reading of that count by mistakenly labeling the crime as aggravated assault:

> Aggravated assault, count four. And the jurors aforesaid in the name and behalf of the citizens of Georgia further charge and accuse Anthony Jackson with having committed the offense of aggravated battery. For that the said Anthony Jackson in the County of Chatham in the State of Georgia did knowingly, intentionally, and unlawfully on or about January 15th, 2006 maliciously cause bodily harm to another, to wit [his former girlfriend], by seriously disfiguring her body by repeatedly slashing or stabbing her with a knife, contrary to the laws of the State of Georgia, the good order, peace, and dignity thereof.

---

[10] We also note that the "offensive weapon" charge did not affect Jackson's aggravated battery conviction, given that the definition of aggravated battery does not refer to use of a "weapon" or to an object, device, or instrument used in an "offensive" manner. See OCGA § 16-5-24 (a).

17

Jackson argues that by initially referring to Count 4 as an aggravated assault count rather than an aggravated battery count, the trial court likely confused the jurors, justifying a new trial.

Again, we disagree. "The general rule is that, a mere verbal inaccuracy in a charge, which results from a palpable slip of the tongue, and clearly could not have misled or confused the jury is not reversible error." (Citation and punctuation omitted.) *Arthur v. Walker*, 285 Ga. 578, 579-580 (679 SE2d 13) (2009). While the trial court initially referred to the crime in Count 4 as aggravated assault, the court went on to state that the crime at issue was aggravated battery and accurately read the substance of the count to the jury. Additionally, a written copy of the indictment went out with the jury, and the verdict form accurately listed Count 4 as aggravated battery. Under these circumstances, the trial court's slip of the tongue cannot be said to have misled or confused the jury. See id.

6. Lastly, Jackson contends that his trial counsel was ineffective in several respects.

> To prevail on a claim of ineffective assistance, appellant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. We

need not address both the deficient performance and prejudice prongs of the test if the defendant has made an insufficient showing on either prong.

(Citation and punctuation omitted.) *Ledford v. State*, 313 Ga. App. 389, 393 (4) (721 SE2d 585) (2011). See *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Guided by these principles, we turn to Jackson's specific allegations of ineffective assistance.

(a) Jackson contends that his trial counsel was ineffective for failing to file a timely special demurrer challenging the form of the burglary count of the indictment. "To succeed on his ineffective assistance claim, [Jackson] was required to show that his trial counsel's failure to specially demur materially impacted his ability to present a defense, thereby creating a reasonable probability that counsel's deficiency changed the outcome of the case." (Citation and punctuation omitted.) *Lewis v. State*, 304 Ga. App. 831, 837 (5) (698 SE2d 365) (2010). "Further, as we have previously noted, because a defendant can be re-indicted after the grant of a special demurrer, a failure to file such a demurrer generally will not support a finding of ineffective assistance of counsel." *Washington v. State*, 298 Ga. App. 105, 106 (679 SE2d 111) (2009).

19

Here, the evidence of record fails to establish that Jackson was unable to present a defense to the burglary count as a result of the imperfections in the indictment identified supra in Divisions 2 and 3. Furthermore, as pointed out above, even if Jackson's trial counsel had filed a timely special demurrer, it would not have prevented the State from reindicting and trying him for burglary. Accordingly, Jackson has failed to show that he was prejudiced by his trial counsel's failure to file a timely special demurrer. See *Wallace v. State*, 253 Ga. App. 220, 223 (3) (558 SE2d 773) (2002).

(b) Jackson also argues that his trial counsel was ineffective for failing to object to the trial court's charge on the definition of "offensive weapon." However, as explained supra in Division 5 (b), the giving of the charge did not affect the outcome of the proceedings, and, therefore, Jackson cannot show that he was prejudiced by his counsel's alleged deficiency.

(c) Additionally, Jackson asserts that his trial counsel was ineffective for failing to encourage him to testify on his own behalf to support a defense of justification and right of habitation. At the hearing on Jackson's motion for new trial, his trial counsel testified that he advised Jackson not to testify because he believed that "putting him on the witness stand could be the worst thing that [he could] do,"

20

given that the State would likely impeach Jackson with his five prior felony convictions, including a prior conviction for aggravated assault, which would have caused Jackson to "crash and burn." Thus, trial counsel made a tactical decision to advise Jackson not to testify, "[a]nd trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *Ledford*, 313 Ga. App. at 393 (4). See *Warner v. State*, 287 Ga. App. 892, 895 (3) (a) (652 SE2d 898) (2007) ("Counsel's advice against putting [the defendant] on the stand was tactical and does not reach the level of deficient performance."). Because trial counsel's tactical decision was not patently unreasonable in light of Jackson's multiple prior convictions, Jackson failed to demonstrate that his trial counsel was deficient.

(d) Jackson further maintains that his trial counsel was ineffective for failing to request a jury charge on common law marriage. But "trial counsel cannot be faulted for failing to request a jury charge that was not authorized by the evidence," *Jones v. State*, 287 Ga. 770, 771 (2) (700 SE2d 350) (2010), and Jackson has failed to point to any evidence introduced at trial that would have supported a charge on common

21

law marriage. Consequently, Jackson cannot establish that his trial counsel was deficient.

(e) Finally, Jackson contends that his trial counsel was ineffective for failing to object to the boyfriend's sister giving victim impact testimony during the sentencing hearing because the defense had no prior notice of her testimony. See OCGA § 17-10-1.2 (a) (3) (authorizing the victim, the family of the victim, or other witnesses with personal knowledge of the crime to testify during the sentencing phase regarding "the impact of the crime on the victim, the family of the victim, or the community"). However, Jackson has failed to explain how the sister's testimony during sentencing prejudiced him, given that the trial court had already heard the boyfriend's testimony that he had been hospitalized for over a month as a result of the knife attack, that the attack had paralyzed him, that he could not live with his wife (Jackson's former girlfriend) because her Section 8 housing could not accommodate his disability, and that his only income now is social security disability payments. Because Jackson cannot establish prejudice, he cannot succeed on his ineffective assistance claim.

*Judgment affirmed. Adams and McFadden, JJ., concur.*

22